NEW YORK COUNTY—HON. CHARLES McVEAN, SURROGATE—1848.

## In re LAWRENCE.*

### In the Matter of the application to mortgage, lease, or sell the real estate of ISAAC LAWRENCE, deceased.

The authority granted to an administrator by the surrogate, to sell, considered merely as authority, is analogous to a power in trust to sell, as distinguished from a trust. It is a judicial decree that the lands be sold to pay the intestate's debts, as well as a judicial mandate to the administrator to execute the decree. His duty is similar to that of a sheriff on execution, and is strictly analogous to that of a master in chancery on executing a decree of sale, and he is vested with a like discretion with them.

Such an order of sale having been made, the administrator should be left free to execute it, and an application by an assignee of a creditor for an order directing the administrator to execute the order of sale in full, by selling all the land embraced in the order and not sold, will be denied. The proper remedy is by attachment, to enforce the order of sale already decreed.

The administrator is bound to show a sound discretion as to the mode of conducting the sale. He is not bound to consummate the sale, if, for any reason, it might be set aside by the surrogate on the ground of unfairness.

The fact that the widow has embarrassed a sale attempted under the order, or that it is probable that she will do so again, by spreading false reports as to the title being subject to her dower,—*Held*, not good cause to suspend the sale under the order.

*It seems*, that the general regulations for the descent and transmission of

* Reported in 6 *N. Y. Leg. Obs.*, 274.

property, in case of the death of the possessor, to his widow, heirs, and next of kin, cannot be regarded as constituting a contract with them, so as to bring those laws within the prohibition of the Constitution of the United States, nor as vesting the expectants, under such laws, with rights or privileges within the meaning of the Constitution of the State.

On the 2d day of September, 1843, this court, then held by the Hon. David B. Ogden, on the application of the administrator, made an order for the sale of the real estate of the intestate. The property embraced in this order consisted of several valuable houses and lots within the county of New York. Previous to the order of sale, the dower of the widow in the lands of the intestate was assigned to her by the Court of Chancery, on proceedings instituted for that purpose in that court, to which she and the heirs-at-law of the intestate were parties. The assignment of dower was an equitable assignment; that is, instead of assigning her dower in each several lot of land, the whole property was considered as one lot, and one-third in value of the whole was assigned to her, so that she held her estate in dower in the lands of the intestate, in entire undivided improved lots. That portion of the land of the intestate thus assigned to the widow as dower, was embraced in the order of the surrogate, and directed to be sold. The order of the surrogate was executed in part, shortly after it was made, by a sale of a larger portion of the lands; and the proceeds, amounting to some $140,000, were brought into the Surrogate's Court, and distributed among the creditors, no portion of them being retained to satisfy the widow's dower. A part of the property sold, on the application for confirmation of the sale, was ordered to be resold by the surrogate. The lands which were assigned to the widow as her dower, as well as some other portions, were not sold. An application was now made by the assignee of a creditor, whose debt had been established in this court, for an order directing the administrator to execute the order of sale in full, by selling all the land embraced in the order of sale, and not sold. In answer to this application, it was alleged that a well-concerted plan of de

preciation·had been arranged, by which the property if sold must be sacrificed as to the creditors, for the benefit of others. It appeared clearly, that in a recent attempt made by the administrator to sell, in pursuance of the order, the legal notice of sale published in the newspaper by the administrator was followed by an equally formal notice by the widow, stating that the lands advertised to be sold, in the advertisement of the administrator, were assigned to her by the Court of Chancery, and " that any title derived from the sale thereof, in pursuance of any order of the surrogate of the county of New York, or otherwise, would be subject to the said decree of the Court of Chancery, and of the life-estate of the said Cornelia Beach Lawrence" (the widow). It was also shown that an opinion in print, signed " Daniel Lord," supporting the widow's title claimed in her said notice, was in existence, and circulated previous to the contemplated sale. It was also proved that attempts were recently made by the widow to purchase the claims of creditors. It was alleged that she had purchased a large share of the debts against the estate. It was alleged also that this application was made for her benefit and at her instigation. It was claimed that by law the sale was free from all claim of the widow's dower, and that this application, if granted, was to be followed by the notice of the widow, and the circulation of said supposed opinion, with the design to sacrifice the property, and that such would be its effect, and that therefore the order compelling the sale should not be granted during her life.

W. B. LAWRENCE and DANIEL LORD, for Petitioner.

G. M. OGDEN and D. B. OGDEN, for Administrator.

J. G. KING, JR., G. F. TALMAN, W. B. LAWRENCE, JR., EDWARD SANFORD, W. VAN HOOK, F. PENTZ, A. D. DITMASS, A. W. CLASON, JR., B. ROBINSON, WILLIAM LAWRENCE, GEORGE S. FOX, for Creditors opposing application.

THE SURROGATE.—Has the surrogate the authority to grant the order asked? The answer to this interrogatory will in-

volve the consideration of the force and effect of the original order of sale; the duties, power, and obligation of the administrator as the selected instrument of the law to execute the order; the authority of this court to enforce the execution of the order; and, if it have such authority, what is the proper mode of its exercise.

An administrator is the personal representative of the intestate, and succeeds to his personal estate. He is not the representative of the creditors, nor of the next of kin, although they are dependent on his administration for securing their interests in the estate. They have no legal representative, they act for themselves. An administrator has no title to, or interest in, the real estate of the intestate, nor is he invested with any power to do any act which will affect the interests of the heirs in such estate. In making the application to the surrogate to sell, he is the agent of the creditors specially appointed by the law for the occasion, by reason of his existing connection with the estate. This agent can, on his own motion, apply for the sale, or the creditors can compel him to apply. He cannot, of his own motion, make the application after three years have expired, but can be compelled by a creditor to make it after that time. The authority granted to him by the surrogate to sell, considered merely as authority, is strictly analogous to a power in trust to sell, as distinguished from a trust. It is a power. There is nothing lacking to make it a perfect power—a full authorization to sell. The power in him is derivative entirely, and is in no sense original, so as to invest him with any discretion in regard to it. The power is derived from the law. The instrument appointed to declare and give effect to the law is the surrogate, and not the administrator. The command of the law is addressed to him. His duty is obedience. He has no other obligation. Although the order may, as it affects the administrator and others, be regarded as an authority to sell, as it regards the administrator alone it is also a command to sell. It is not only a judicial decree that the lands be sold to pay the debts of the creditors, but it is also a

judicial mandate to the administrator to execute the decree.
It is not only so in form, it is also so in force and effect.
What difference can there be between the force and effect of
a judgment of this court, made in pursuance of law for the sale
of the real estate of the intestate to pay creditors, and a judg-
ment in the Court of Chancery, where the jurisdiction of the
two courts is the same?

The decree of a high court is not more potential than
the decree of an humble court: it is jurisdiction that con-
fers power; and when the court has jurisdiction, it is the
sovereign authority of the State that commands, than which
no authority can be higher. The decree of this court is con-
sequently as high an authority, of as much force, and as ob-
ligatory, as that of the Court of Chancery. It is a full and
perfect appropriation of the lands. It commands the admin-
istrator to give effect to this appropriation by sale. He is
the ministerial officer appointed by the law to execute this
decree. His duty is similar to that of a sheriff on execution,
and is strictly analogous to that of a master, on executing a
decree of sale. His duties in executing the order, as pre-
scribed by statute, are almost a literal transcript of the pre-
scribed duties of a master. He is to advertise the sale a
prescribed time; he is to affix notices of the sale in public
places; he is to report the sale for confirmation; and if con-
firmed, he is to execute a deed of conveyance to the pur-
chaser; and he is to bring the money into this court to abide
the order of distribution. This is a master's duty on the
same decree, in detail, and his whole duty. His duties being
the same as a master's in executing the decree, it follows
that his powers and obligations are the same. He is not in
any sense a trustee, nor can he exercise the discretion of a
trustee. He has no more right to delay a sale than has a
master. The exigency of the decree is, that he execute it
presently, now. That fact is, as to him, judicially deter-
mined, and being so determined, has the force of a judicial
determination; and a ministerial officer, who is called upon
to execute the order, has no right to question its wisdom or

expediency in this or any other respect. Passive obedience is his duty.

This application for a new order is founded in a supposed necessity of having an order more stringent in its requirements and more impulsive in its character than the order of sale. The order of sale, in the plainest terms, commands in itself its own execution: either that command is without force, or the order now asked for is supererogatory. The law has spoken in that order, and it is the only order it has authorized in express terms. I do not think that I could, by any order not recognized by law, nor contemplated by it, give any force to the order provided by law, to consummate its declared object. Any attempt to add to it, to make it more authoritative, would be to disparage its force and to detract from that fulness and perfectness which it possesses. Could I bring myself to believe that there was authority for this application, it would follow, in my belief, that the order of sale was not mandatory—that it was not a peremptory order to sell presently. That consequently the executor had a discretion, other than that of a sheriff or a master, to revise the order and consider its policy and delay the sale. If I possessed the authority to make this order (now asked), it would follow that the time of executing the order was not before judicially determined, and, of course, that a discretion as to its execution was left. In such a view of the case, I would be bound, in exercising such conceded discretion, to grant an order postponing the sale, or stopping it until such time as in my judgment the interests of the creditors would be best subserved. I cannot charge the means provided by the law to accomplish its end, with such uncertainty or imperfection. I regard the order of sale as full and perfect, both as an authority and as a command, and that it imposes as fully and as perfectly the correlative obligation of obedience on the administrator. I regard the order not only as full and perfect, and therefore incapable of being made better or stronger, but also as immutable. It must stand forever between these parties, unchanged. It leaves no discre-

tion to me, or to the administrator, as to any matters deter-
mined by it. It is as binding on me as on the administrator,
and its obligation is as perpetual as it is imperative. Noth-
ing therefore remains for this court to do, except to enforce
obedience to its decree; and, in my judgment, that is not
done by reiterating its commands.

The provision of the statute conferring power on this court
to enforce its decrees, is in these words: " Every surrogate
shall have power to enforce *all lawful orders*, processes, and
decrees of his court, by attachments against the person of
those persons who shall neglect or refuse to comply with
such orders or decrees, or to execute such process; which
attachments shall be in form similar to that used in the
Court of Chancery in analogous cases." (2 *Rev. Stat.*, 155,
§ 6.) The attachment is given to enforce all lawful orders.
That this is an *order*, and that it is *lawful*, cannot be ques-
tioned, nor can it be questioned that, literally speaking, it is
within the statute. On the supposition that the order of sale
is an order within that provision, it will afford the fullest
scope to make the exercise of power in this court analogous
to that of the Court of Chancery. In such a case, whatever
would justify a master from attachment, in not selling or
proceeding to sell, would justify an administrator; and
whatever would excuse a master would excuse the adminis-
trator. This will make the analogy perfect, as to the powers
of the court to grant the order, the duties and obligation of
him upon whom its execution is imposed, and the power of
the court to enforce its execution. I am fully persuaded
that this is the true construction of the statute, and that the
precedents in the Court of Chancery will in all respects
apply with equal force to this, and thus afford to all parties
the opportunity of treading on familiar ground.

The embarrassments to the proper execution of this order,
which the administrator has encountered and which he is
likely again to encounter, arise from the claim of the widow
to hold an indefeasible estate in dower in the lands ordered
to be sold; and that any sale that is in the power of this or

any other court to make, will give the purchaser no right to the possession of his purchase, nor to enjoy its profits, during her life. She does not rely in silence upon rights of which she cannot be divested. She is anxious to impress those views upon others. She is industrious in the use of means to depreciate the property, and make the sale practically to the creditors subject to her dower, whether it is so in law or not. That it is her design to make the cloud thick and dark over this title, is scarcely concealed. That she can have no interest to do so on the supposition that her rights are vested, is as manifest as her interference. The means that she uses are the best that could be devised to accomplish the end in view. The end is, to have the property sold at prices in which the purchasers will buy in reference to her supposed estate for life. The means are the formal notice accompanying the advertisement of sale, referring to a decree in chancery establishing her rights, and asserting her rights to be indefeasible; together with the circulation of the supposed opinion of Mr. Lord, supporting her claim. If this court has the constitutional authority to order the sale in the manner in which this has been done, which is the manner prescribed by statute, the interest of creditors in these lands to have them appropriated to the payment of their debts became vested at the death of the intestate, as much so as those of the widow; and it is against the first principles of justice, as well as against every principle of law, that a partition or division of lands or assignment of dower, in a proceeding in a Court of Chancery, in which the widow and the heirs only were parties, should be allowed to affect, in any manner whatever, the rights or interests of the creditors. The decree is binding upon the parties to it, forever. It is, as to these creditors, as if it had never occurred, in all matters affecting their rights and interests in this estate. It is, as to them, a perfect nullity. That it was the design and intent of the Legislature that the effect of the sale on the order of the surrogate should be to vest the purchaser with the title of the intestate, free from the very claim which is here set up, is too manifest

to admit of question, and has not been questioned. The Legislature declares by law that such shall be the effect of the sale, in so many words. If it was competent for the Legislature to pass such a law, it is, beyond controversy, the law of the land. The authority of the Legislature to pass it is denied on the behalf of the widow, as being unconstitutional. The constitutional objections to the validity of the statute are, as I understand them, founded on the provisions of the Constitution of the United States, prohibiting a State from passing any law impairing the obligation of a contract; and on the provisions of the Constitution of this State, declaring that "no *member* of this State shall be disfranchised or deprived of any of the rights secured to any *citizen* thereof, unless by the law of this State, or the judgment of his peers;" and also, by implication, on the clause relating to the taking of private property for public use.

The statute passed after the marriage of a woman, allowing her dower to be admeasured to her in money instead of the land, which was the law at the time of her marriage, against her consent, is supposed to be in conflict with one or all of those constitutional provisions. This objection supposes that a general statute regulating the descent and transmission of property, in the case of death, is either a contract or a vested right, or privilege of citizenship or otherwise, so that those laws cannot be altered under the circumstances mentioned. The wife's right is this: the statute provides that in case she survives her husband, she shall, after his death, be endowed of his lands. The statute of descents provides that a son, who is an only child, shall succeed in fee to the same lands, in case the father shall die intestate, and shall not have sold the same during his life. The law promises the son, that in case his father shall die seized and intestate, the fee shall descend to him. The father dies seized and intestate,—can it be said that if the Legislature had changed or altered the descent after the father was seized and the son was born, and before the father died, that the law was unconstitutional, or that the son must take, notwithstanding the alteration? or

can it be said, that because the wife's right depends upon the happening of one contingent event, and the son's on two, that they are different? The interest in neither case vests until the death of the husband or father; and the promise is equally strong to both, on the contingencies mentioned in each case. The rights in either case have the same characteristics. They are imperfect, inchoate, and contingent; alike imperfect, alike inchoate, and although not contingent in the same degree, alike contingent. Death of the owner, and death only, in either case, makes the right perfect. Death makes the wife a widow and the son an heir. If they die before him, no title dies with or descends from them; they have none to lose or transmit. They never had any. During the life of the husband, the wife can by statute release her imperfect right, or mortgage it, in conjunction with her husband; and so far, and so far only, is her right regarded in law. The son can bargain and sell his right of inheritance during his father's life, by a binding executory contract. So far are his rights regarded in law. The widow's right to administer, in case of intestacy, is of the same class of rights, and is considered a valuable right. I do not think that general regulations for the descent and transmission of property, in case of the death of the possessor, to his widow, heirs, and next of kin, can be regarded as constituting a contract with them, so as to bring those laws within the prohibition of the Constitution of the United States, nor as vesting the expectants under such laws with rights or privileges within the meaning of the Constitution of the State. If such laws are within the constitutional provisions mentioned, it follows that they cannot be changed so as to take effect while the wives and children of the existing generation can, as to themselves, show that the change was made after they became wives, or in case of the children, after they were born, for the promise is to all of them alike.

Statutes divesting persons of their fee in land, against their will, and giving them money in exchange, are constantly enforced in cases of partition in the Supreme Court and

Court of Chancery, and in the same proceedings, widows are compelled to take their dower in money, against their will; yet I believe the constitutionality of these laws has never been questioned. This question, although involved in the discussion of this motion, I do not consider the point of the case, so as to require further discussion of it from me. As far as this court is concerned, it is a determined question. It was so determined by the surrogate when he granted the order. I deem it, however, proper, and as due to the administrator and the creditors, to say, that I regard the statute as clear and emphatic in its declaration, that the purchaser under the sale will take the lands free from the claim now set up by the widow, and that no other sale can be made; and that there is not, in my opinion, any constitutional impediment to its having its full force and effect as a valid law of the land, as it purports to be. So entirely am I persuaded of this, that I would not hesitate a moment as to my duty to invest the proceeds of sale for her use, and pay her the interest thereof. Should she, therefore, succeed to have this sale made as if subject to her dower, the creditors' interests will be subject to a double dower;—the one, practical, from such a consideration influencing the sale; the second, inevitable, from the absolute requirements of the statute.

Notwithstanding these embarrassments, it is the duty of the administrator forthwith to proceed with the sale. The embarrassments are not intrinsic, but casual and temporary. This sale is an ordinary remedy for the payment of debts; and for a court to authorize the forbearance to sell as a remedy for the payment of debts, because combinations supported by errors of opinion are at work to depreciate the value of the lands, would be to charge the administration of justice with a want of sufficient energy to accomplish its end; and would, in effect, be saying that truth had lost its moral force to dissipate error; neither of which propositions are admissible as a ground of judicial interference.

I have said that the administrator was not vested with any discretion in this matter. I meant, in the sense that it was

claimed. He has a limited discretion. It is, however, the discretion of the sheriff on an execution, or the master on a sale. The statute says the sale shall be in the county where the lands are situated. To sell at Harlem would be a compliance with this statute, yet it would not be a discreet exercise of power, and this court would set it aside as not being fair; for, in the exercise of a sound discretion, he is bound to sell at the Exchange. The statute says the sale shall be made between the hour of nine in the morning and the setting of the sun; yet if made in this city at four o'clock in the afternoon, this court would set it aside, as not fairly made; for, in the exercise of a sound discretion, it ought to be sold at the usual hours of the sale of real estate at the Exchange. If the sale was advertised to be made at the Exchange in the morning, and a snow-storm should on that day block the streets so as to prevent purchasers coming, the sale would not be made fairly, if made;. or if, while the sale was progressing, a fire should break out and call off the bidders, and thus prevent competition, and the sale was consummated under such circumstances, it would not be fair. If the administrator discovered, on the day of sale, a combination among men, the effect of which would be to destroy the ordinary competition, and should consummate the sale, it could not be regarded as fair. The surrogate is enjoined by the statute not to confirm the sale unless it be affirmatively shown that it was fairly conducted; and where the sale would, in the judgment of the administrator, if consummated, be palpably so unfairly conducted that the surrogate would be bound to set it aside, he need not, I think, consummate it, but may postpone it temporarily. This is the law as regards sheriffs and masters. If he has not the discretion of a trustee, or a judicial discretion, he is not an automaton, to move only as he may be acted upon. He is to have his eyes and his ears open, that he may see and hear every thing that may affect the sale. He is to be diligent in removing obstructions and impediments, whether arising from the elements or the contrivances of men. He is bound to have the sale fairly

made, and the means that he uses must be those which will best secure that end. I think it would be his duty, if the sale was embarrassed with a claim that the purchaser would take subject to the widow's dower, to declare that such was not the effect of the sale; and that the sale was made on the condition that the conveyance by the administrator would convey the estate of the intestate "free and discharged from all claim of dower for the widow of the intestate," in the language of the statute itself. Nay, more; if in the exercise of sound judgment he is of the opinion that the embarrassments are such that a sale cannot be fairly made, unless the fullest scope be allowed to the purchaser to try the question of the widow's title in a competent court, before he shall be compelled to pay the purchase-money, it would be the duty of the administrator to take a nominal sum as part of the purchase-money, from a responsible purchaser in good faith, merely to give validity to the bargain, that such question might be raised on a bill for a specific performance by the administrator, and put in process of determination without loss to any one. In the exercise of a sound discretion he is also permitted to sell, on a credit of three years, for not more than three-fourths of the purchase-money, and submit such sale to the surrogate for his approval. He must adapt his means to the end, and that end must be the highest price. His own discretion is to guide his judgment under the law. What I have said by way of illustration of my views, is not to be considered advice. The administrator must be left free to act under the order as it is, and I must be left free from the embarrassments of extra-judicial advice when I am called upon judicially to review his conduct. This application is dismissed without costs to either party, and without prejudice to the rights of any creditor to make application for an attachment.